May it please the court, counsel. I'm Bobby Jones and trustee for Premier Spectrum Group, PMA, Private Membership Association. We've agreed to split the time 15 minutes with the Janus attorney, 3 for us and 12 for the Janus attorney. Well, counsel, you've been informed that as an individual representing himself you may not appear on behalf of Premier. So any arguments that you make on behalf we would have to disregard. So please focus your arguments on your own personal case. Well, I believed in the Spectrum opportunity and had purchased license applications from SmartCom, a company in Phoenix that was doing the same thing that Janus did prior to Janus. And they had given me a letter of March 17th of 2010, stated that they had completed an investigation of SmartCom and did not intend to recommend any enforcement of that. So based on that I believe... When you say they had given you a letter, who are you talking about? SmartCom. I'm sorry, ma'am. And so I believed in the opportunity enough to set up the PMA for the purpose of including family members, close friends, ministers, missionaries, that my wife and I had paid for 30 of approximately the 43 memberships. I'll reserve the rest of my time for... Okay. For rebuttal. All right. Thank you, counsel. Thank you. I mean, thank you, Mr. Jones. May it please the court, counsel. My name is Tom Littler, Thomas Littler from Phoenix. Would you turn up the sound, please? Should I get closer maybe to the judge? That's better. How's that? It's just kind of in my face a little bit. I'm Thomas Littler from Phoenix. I represent the appellants Janus Spectrum, David Alcorn, and the David Alcorn Professional Corporation, who are the appellants in this case, and the defendants below. Now this case, as you know, was decided, your honors, this case was decided on summary judgment below. And our position is that with the substantial record that we submitted to the district court, contesting each and every one of the statements of facts that was material in the SEC's motion for summary judgment, that this is not a case that could have or should have been decided consistent with the mandate of regarding the asserted violations of securities law. Well, every one of them that was contested because they're very intelligent. Well, the fact that it's contested doesn't necessarily mean a material issue of fact was raised. So I'm asking you to specify with some precision what the specific evidence was on each of the asserted violations that raised the material issue of fact. All right, let me start then with the value of spectrum. Because that seems to be, you can tell from the even the SEC's brief, the value of these licenses that Janice was applying for was a key issue that permeates everything. In other words, if Janice was selling license application services, the SEC says that those licenses that would be acquired by the client from the FCC are not worth anything. Well, the specific issue was whether or not there was a misrepresentation regarding the value of the licenses. Right, but whether they have value or not is important. And I'll get to, let me get to the value of the evidence and then I'll get to the representations. In the order by the district court, it's one of the key questions of fact is that all our witnesses agreed that the spectrum had no value, it couldn't be used by a major wireless carrier. So and that was what the representation was, that these these licenses could be leased or purchased by a major wireless carrier. So what evidence was there in the record that these licenses were viable for lease by major wireless carriers? Well, we submitted declarations and reports of experts. For example, we submitted the testimony of Mr. Tripp Forrest, our engine ear who specializes in this business. Will you spell his name? Forrest is F-O-R-R-E-S-T. If we're in the in that declaration to find a statement that these licenses would be sought after by major wireless carriers. He testifies in the record at ER 56 and 57 saying that they are currently being used by major wireless carriers. That they are what? Currently being used by major wireless carriers and can be used by major wireless carriers. So if the licenses were just being released, how were they being used by the major carriers already? Because some of them were already in that spectrum and the idea and the concept was they couldn't use that spectrum for their cellular services. So his point was they're already using it for the cellular services, so they're going to want it back. But that was not the only testimony. Can I go through the rest of the list? Of course. Okay. Mr. Lewis, who was a consultant in this business and once again, his record, his vitae is in the record, testified the carriers What? Give us a record citation, would you please? Yeah, I will, your honor. He said that the carriers could and still can use these licenses for their cellular services and that's a record of 65. 65? 65, your honor, yes. We hired an and he said that the... Steeple? C-bolt. C-bolt. S-E-Y-B-O-L-T. I probably should stay by the microphone. He was our independent expert and he said it could be used. Record? At 75 and 237. The JANIS frequency coordinator, Mr. Moncure, said that the representation that these licenses... Mr. Moncure? Moncure, M-O-N-C-U-R-E. He said that the representation that these licenses could be used by a major wireless carrier was, quote, entirely truthful, unquote, and that's at 225. Let's go back to Mr.... Can I have one more, your honor? Okay. I thought you wanted me to give the list. Go ahead. And then we have Mr. Tillis, who's the attorney, who was involved in the rebanding process. Tillis? Tillis, T-I-L-L-E-S. He was the JANIS attorney, but he was also the one that was involved with the FCC in the rebanding process before that. He said that JANIS could turn around and sell to Sprint. It was not a misrepresentation. So that representation, he says, was knowing about the rebanding and frequency, said it was not a misrepresentation, and that's at 153. He also said there's no preclusion to them, major wireless carriers using it, and that's at 94 to 96. So this is the attorney? That's the attorney, knowledgeable. Could we go back to page 56 of the record, Mr. Forrest, that you referenced? Yes. Are you talking about the language at paragraph 3, that first sentence? Yes. Okay, so it said it is currently being used for low-density cellular operations, but wasn't the representation that high-density cellular operations such as Sprint, Verizon, and the other major carriers would be interested in these licenses? No, I don't believe it was, Your Honor, because there's one of the problems I found with this case, even when I was trying to understand all this use, and Mr. Tillis really explained this a lot in his deposition, which is in the record, but I don't have the sites, because there's low-density, high-density, there's broadband, there's high-site, low-site. And as Mr. Tillis explains in his testimony, that certain uses by major wireless carriers could occur, and they would want them to occur. And this is another important factor that the court needs to consider when considering whether these were misstatements or not, is that there's all kinds of different uses by major wireless carriers. When you get your cell phone out, you have talk, you have video, you have internet, you have all these different uses. And what Mr. Tillis explains in greater detail is that you can move some of the uses off of some bands and on to other bands, because one of the things that the court needs to keep in mind is that these are out there. And that's why it became kind of a gold rush when these licenses became available to the public. But wasn't the point that the desirable use for the licenses was for broadband? Wasn't that the point? I don't believe so, Your Honor, and that's not supported by the record. That is a use. And that's where, and this is important for the court to consider, we've explained this, where Mr. Tillis says that a no spectrum below 861 megahertz can be used for broadband didn't apply to the licenses that Janus' was applying for on behalf of their clients. So It would be pertinent if the clients were led to believe, if the investors were led to believe that money could be made through selling these licenses to carriers that use broadband. I don't believe the representation was that limited. I mean, even if you look at the record, it was just two major wireless carriers for their use, not necessarily just for broadband. I don't recall anything on the record that limited it. There may be some discussions about that in an anecdotal type way, but that wasn't the limit, is that it can be used for broadband. And remember, there's also representations to the fundraising investors that are separate and apart from the Janus clients. From your perspective, what were the representations that were made by Janus vis-a-vis the investment potential of the licenses? What were the representations that were actually made? There were representations made that it was a finite resource, that it was limited, which is true, and that it's only available for a limited time, which the record has references that it was anticipated that everything would be rebanded, would be complete within three years, that it was first come, first serve, and that there were a number of different uses, one of which probably, if you look at some of the language, probably could be carriers wanting some of that back. Were the names Verizon, Sprint, AT&T ever used? They were. Didn't Alcorn tell investors that Janus Spectrum would manage and monetize the licenses, which Janus never did, is that correct? At some point. Of course, early on in the case, they did have a provision that they would manage and monetize, but they took that out of the contract. But there also is in the contract's specific language that the responsibility for the licenses is with the client. Because remember, the client is the one applying. There's no pooling of money. They pay Janus to get them a license, and Janus applies on behalf of the client. I'm just trying to get the facts in the record, and that was on 716-17 about what Alcorn represented. Also, there was evidence in the record that an employee in Sprint's legal department told Alcorn that the company would not do business with Janus Spectrum. Is that correct? Yes, but it's really important for the court to understand that, and it's consistent with this case, the timing of that and when it occurred. That statement was made when Mr. Alcorn was doing due diligence before he bought an application from a third party, SmartCom. That was told to him by somebody in the legal department that they were not available at that time, and that's in Mr. Alcorn's declaration, which I'm running out of time, so I don't have the actual site to it, but it is in Volume 2, Mr. Alcorn's declaration saying, he told me that they weren't interested at that time in the early part of the process. And then after that, he did all this other due diligence, retaining all these experts, all these people that said, yes, they might be interested, they could be interested, they could use it, and this is why. Because there was a lot of mistakes early on, and I'm using all my time, so I'm not going to have any time for a rebuttal, but I'll just finish. There was a lot of misunderstanding in this rebanding process, and that's why Tillis' testimony is so important, because he was involved in it, that what could these licenses be used for? What are the limitations on it? And how can they be used? And that was all developed in the early stage of rebanding to an understanding later on that these could be used by wireless carriers, that they want these licenses. And my red light is flashing, so. All right. Thank you, counsel. We'll give you a minute for a rebuttal. Oh, thank you. We hope you use your time. Thank you. Your Honors, and may it please the Court. Martin Totaro for the Securities and Exchange Commission. This is an appeal arising out of a fraudulent scheme that collectively deprived hundreds of investors out of millions of dollars. If it works for the Court, I think I'll start with Janice Spectrum, and then if there's any questions at the end for Mr. Jones, I'd be happy to answer them. I was going to start with the Section 5 allegations that the District Court decided on summary judgment, but I think I will turn to the anti-fraud provisions, just to correct some of the statements that were made previously. The key question for the anti-fraud provisions is, were these licenses of value to the major wireless carriers? It's not a metaphysical question about whether these licenses had some value to someone or whether the licenses might have value in the future. And on the question of whether the major wireless carriers, like Sprint, et cetera. Counsel, what's your response to opposing counsel's direction of us to certain testimony in the record that he contends at a minimum raised a material issue of fact regarding this point? Your Honor, I just urge the Court to look at the particular record pages he gave. I will also happily offer several others that directly contradict what he said. For example... Well, it doesn't matter if they contradict. If there's a material issue of fact raised, we have to look at the evidence in the light most favorable to the non-moving party. So it doesn't really get you very far to say there's other evidence in the record. I agree, Your Honor, and I might have spoken loosely. What I meant to say, for example, Mr. Forrest was brought up, the engineer. Mr. Forrest, in his testimony, candidly said that he has no experience valuing Spectrum and that major wireless carriers would have no use for the licenses. That's on supplemental excerpt page 58, 60, 545, and 546. Sebald, the consultant that was referenced in the opening presentation, said he's not opining on valuation. That's at excerpt record page 238. Tillis, the lawyer who was referenced in the opening, said that Spectrum can't be used for wireless and that it's, quote, misleading to say otherwise. That's on supplemental excerpt page 860, 880, and 864. And so these sorts of lists go on where, if you look at our brief and the citations, they exactly and precisely match up with what is in the record, and that is not always true on the other side. I could also point out that Alcorn himself acknowledged, this is at supplemental excerpt page 709, that he wasn't an expert on valuation. So his beliefs about valuation had to come from somewhere else. And as was noted, Sprint told him, we are prohibited from coming back into these licenses. We cannot buy them or relicense them from you. Now, that just wasn't at the beginning, at the outset. Nothing changed. I think a stark example, Your Honors, is at supplemental excerpt page 724. This is well after Mr. Alcorn initially talked with Sprint. Alcorn acknowledged that he read an article titled, and there's no ambiguity here, fair warning from Sprint, we can't buy 800 megahertz Spectrum. We just returned to the FCC. Alcorn said he disagreed. Respectfully, it's irrelevant whether Alcorn disagreed when he acknowledges he is not an expert on valuation, and the valuation expert estimates had to come from somewhere else. And people who were telling him about the estimates said they had no value whatsoever to the major wireless carriers. And to wrap this up, Alcorn himself acknowledged, and this is at supplemental excerpt page 1118, this is in a March 2013 conference call. He says, quote, most people, and this was engineers and even lawyers, when they initially look at this 800 megahertz rebanding, the thoughts are they have minimal economic value because they were thinking they are not ready. And here's what Alcorn says, they are exactly correct. Moncure, another person referenced in the opening, said, quote, these bands are almost a waste of time. And that's at page 869 of the supplemental excerpts. Unless there are any other questions on valuation, I'd also like to turn to the section 5 allegations. So Janus Spectrum does not contest that the it wasn't a necessary participant or substantial factor in those offerings and sales. And the commission fully acknowledges that this issue is often one of fact. But there are several factors that, when present, allow this issue to be decided on summary judgment. And those factors are at issue here. The leading case on this subject is probably this Court's decision in CMKM from 2013. In that case, the Court said, you can't impose liability for those with a, quote, de minimis or insubstantial role in a security scheme, probably because section 5 is a strict liability offense. But you can impose liability for significant and continuing involvement in the development and execution of a scheme to distribute securities. That's basically, what is the person's involvement on the front end and the back end? In that case, the Court, when it discussed an earlier case, this Court decided in Murphy from 1980, if you're devising the scheme, if you're meeting investors, that is sufficient to meet the standard on summary judgment that you are a necessary factor and a substantial participant. Here, as discussed, those factors are amply met here. So Alcorn's claim is that, quote, Alcorn spoke with fundraisers directly. That's at page 795 of the supplemental excerpts. Johnson, one of the fundraisers, said he would put the entities in touch with Alcorn and Mayerky and that, quote, most members who joined did so as a result of those meetings. We were talking about misrepresentations before. The Janus Spectrum and Alcorn created pro licenses. Those were then presented to the fundraisers and then sent along to the clients. And that's at supplemental excerpt page 588 and 603. Well, let me make it clear what you're saying. Are you saying that defendant's statements that they didn't help sell membership interests in Premier Spectrum are not enough to overcome summary judgment? Yes, Your Honor. A conclusory statement that is not backed up by anything in the record is insufficient to defeat a grant of summary judgment. The leading case there in this context is probably this Court's platforms wireless case. And in that case, the Court said you cannot just say something isn't so to defeat summary judgment. And to wrap this up for this part of the presentation, lest there be any doubt about Alcorn's role with the particular fundraisers and the investors, an investor contacted a fundraiser and wondered if this entire thing was a sham. So the investor, or I'm sorry, the fundraiser didn't answer the question directly. Instead, he pivoted and asked Alcorn how to help. And so Alcorn then directed an associate of his on how to assuage the investor's concerns. And he said, let's neutralize this. That's at supplemental excerpt page 1108 and 1109. Many of the misrepresentations in this case were in the money from thin air presentation. And I know Alcorn has said that there is a disputed issue of fact as to whether he had any role or edited the presentation. But the only dispute is his own say-so that he didn't edit. But if the Court looks at page 733 of the supplemental excerpt. Mr. Tarr, are you arguing that Mr. Alcorn and Janus had to prove a negative, that they didn't participate at all? I mean, isn't that difficult? It would be difficult. I'm not asking the Court for Alcorn to prove a negative. Here in this case, the Commission brought forth overwhelming evidence of direct contact between Alcorn and Janus Spectrum and not only the fundraisers, but also the investors. So you would say that Alcorn could only dispute that by saying it's a case of mistaken identity? Not a case of mistaken identity. It wasn't me. It was somebody else called Alcorn. It wasn't me. It was someone else. That didn't actually happen. I was so-and-so on such-and-date. Or he could dispute the authenticity of some of the statements in the record. But here you have overwhelming evidence in the record. I'm not so concerned with overwhelming evidence. What I'm concerned with is whether Mr. Alcorn and Janus disputed any of the occasions on which the SEC says they made representations or participated or were a substantial participant. Yes, Your Honor. So if you look at Alcorn's and Janus Spectrum's brief, there is nothing addressing a specific time. There is nothing addressing a specific meeting where Alcorn says that particular meeting didn't happen. The pages the SEC cited in its response brief, those are wrong. That's incorrect. Rather, there is just a conclusory statement that is Alcorn's say-so, that it didn't happen like that. And under this Court's precedence, that is simply insufficient to defeat it. It didn't happen like that? Don't they give some facts as to why it didn't happen like that? I don't think so, Your Honor. I think the brief says we didn't meet with investors full stop. Unfortunately, that's contradicted at numerous instances in the actual record itself. So a blanket denial that they met with investors, it does not raise an issue, a triable issue of fact as to whether they met with investors? That's difficult for me to grasp. It's not a, one could imagine a blanket denial that says that wasn't me, I wasn't there, I was somewhere else or something like that. But here you have repeated interactions between uncontradicted except for Alcorn's own say-so. Which is that I didn't do that. This is a misrepresentation. There is a categorical statement that I did not meet with investors, but that is belied by all of the actual record evidence. That he did in fact meet. He did on numerous occasions. As I referenced, one of the fundraisers said, quote, most of the actual investors who came in to be defrauded in this fraudulent scheme were brought in because of meetings with Alcorn and Mayerky. Counsel, I'd like to go to the prejudgment interest. Yes, Your Honor. You conceded that the prejudgment interest amount should be reduced? Yes, Your Honor, that's footnote eight of our brief. So do you think it's appropriate for us to remand for the district court to amend the judgment to that extent? I think that would be possible. I don't think it's necessary because Mr. Littler and I were able to agree on what the proper amount of the interest should be. And so there's no dispute on that point. But the problem is the judgment says otherwise, doesn't it? So I think, I don't have a specific example, but I'm aware of other cases where a court of appeals is able to say, we affirm the judgment except that the prejudgment award is, in this case, knocked down by about $200,000. So I think that's a procedural issue that this court has the ability to change. I think a limited remand with instructions to reduce it according to how we agreed in footnote eight would also be appropriate. I'm just concerned that if someone looked at the judgment, the judgment still reads that way. Right. I think the court would say the judgment is affirmed except to the extent that. But if the court would be, if the court is more comfortable with a limited remand for that purpose, the Securities and Exchange Commission certainly wouldn't object. If I could address just a couple more points. In the opening, Mr. Littler stated that, look, Janus Spectrum is just a licensed application services company. That is incorrect. On page 871 of the supplemental excerpts, Alcorn says, we are not a licensed application company. And so I think that is another example where if I urge the court to actually look at the record sites to see whether it matches up with the Commission's theory of the case or Janus Spectrum's theory of the case. I'd be happy to answer any questions about Janus Spectrum or the Jones appeal as well. If there are no further questions, thank you, Your Honor. Thank you. Rebuttal. Sorry. No problem. Are you taking Mr. Jones' rebuttal time as well? I'm not sure how much he has. He had three. I think he had two minutes. A minute and a half. I have a minute and a half? Yes, thank you. Okay. Thank you. Welcome to Congress. Deferring his time. Mr. Litley, could you address any particular portions of the record in which Janus or Alcorn specifically deny meeting with any investors at any time? That specific question I probably can't, although I can tell you that we dealt with these various contacts with the fundraising entities and the investors, which we say there was none, in our reply brief, I think starting at page 11. We deal with each one of these specific claims that the SEC made in their answering brief that they argued to the district court, which led to the conclusion that Janus and Alcorn were substantial, provided substantial assistance. And our position overall is that they didn't. They provided some anecdotal contact with people that was essentially giving them information about the status. Because remember, they're filing these applications. Everyone's anticipating the FCC is going to do this within three years, and then it's being dragged out. So the people that were running the fundraising entities wanted information on what is going on. So you're saying that Janus and Alcorn did have contact with investors with respect to the purchase and sale of these licenses? Not with investors, but with the fundraising entities. With fundraising entities. Right. And I think that's a question of fact. And the more the SEC argues their position, the more I'm convinced that there's substantial questions of fact and that the SEC, as well as the district court below, is evaluating the credibility of the witnesses. When I heard the SEC cite counterpoints to my points and cites to the records as to the value, the uses by major wireless carriers, it sounded like a cross-examination. What do you do with a Hernandez case that 343 Fed 3rd, a 9th Circuit 2003 case, has said defendants' own contradictory statements cannot controvert the record evidence because such statements are the type of unsupported conjecture or conclusory statements that cannot defeat summary judgment? I understand, Your Honor. In Arizona, we have a reference to what they call sham affidavits. Yes. If somebody provides an affidavit that's inconsistent with testimony that they've given. I've dealt with that issue. May I be allowed to answer? Of course. Thank you, Your Honor. But we don't believe that's the case here. We don't believe that there is a sham affidavit. We don't believe that Mr. Alcorn testified contrary to his sworn testimony. And if it's an email or based upon an email, it could be taken out of context. And that's why we think this case should have gone to a jury, to allow the jury to see the entire picture of what context every statement was pulled from an email or made to a party or what happened here so that they could make a determination. Because in the context of summary judgment, in a case this complicated with this many facts, there's so much that you have to say and so little time to say it, like me right now running out of time. Thank you, counsel, if there are no further questions. Thank you, Your Honor. The case just argued is submitted for a decision by the court. We thank both counsel for your helpful arguments. Thank you, Mr. Jones.
judges: Murguia, Hurwitz, Zipps